## OFFER v. SWANCOAT.

No. 8366.

Court of Civil Appeals of Texas. San Antonio.
March 5, 1930.

Rehearing Denied April 9, 1930.

On Rehearing April 23, 1930.

Further Rehearing Denied May 14, 1930.

900

S. T. Phelps and Thos. H. Ward, both of Laredo, for appellant.

Gordon Gibson and Mann, Neel & Mann, all of Laredo, for appellee.

COBBS, J.

Appellee sued appellant to recover damages in the sum of $30,000 for loss of income, decreased earning capacity, pain, and suffering, and $732 for medical and surgical attention, as the result of an automobile accident. Appellee alleged that he was a guest or invitee of appellant, in appellant's automobile, and that the accident occurred by reason of the negligent manner in which appellant drove and managed said automobile; and that as a result of the accident appellee sustained two broken ribs and other minor bruises about the body, and a cut on his forehead.

Defendant, appellant herein, answered by general and special exceptions to plaintiff's petition, and by general denial. He answered specially, and specially denied that he was negligent in the operation of the automobile, asserting that the accident was wholly unavoidable on his part, and was caused by the negligence of another person operating a truck on the highway at the time; the driver of said truck having failed to observe the rules of the road and traffic regulations, and having failed and refused to drive on the right-hand side of the road, and continued to drive in the middle, and thereby crowded appellant off the pavement, causing appellant's car to swerve and run into obstructions at the side of the road.

Appellant alleged that at the time of the accident he and appellee were engaged in a joint enterprise and common venture, which included the driving of an automobile. Appellee and appellant were en route home from Kansas City, Mo., where they had gone to inspect an apartment house with the view and purpose of exchanging appellee's farm in Webb county for same. The trip to Kansas City and return was made under and by virtue of an agreement between appellee and appellant, and the expenses of the trip were to be prorated between the appellee, the appellant, and one Dr. Dunlap, who was making the trip to Kansas City for the purpose of making an exchange of certain property; the said appellant acting as the agent of both appellee and Dr. Dunlap. Dr. Dunlap did not return with them, as he became sick while in Kansas City and remained there.

It was alleged that by virtue of the relationship of the parties the appellee assumed the risks ordinarily arising from automobile travel, and if appellant had been negligent in the manner of operating the automobile, as alleged by appellee, such negligence was imputable to appellee, and thereby he is precluded from recovering any damages for injuries resulting from said accident.

It was alleged appellant was acting as the agent of appellee in an endeavor to help the appellee to exchange his farm in Webb county, Tex., for an apartment house in Kansas City, Mo., and if appellant was negligent such negligence is imputable to appellee.

This case was submitted to the jury on 13 special issues, all of which were answered in favor of appellee, and against appellant, and the jury returned a verdict for $11,000 in favor of appellee, and the court entered a judgment therefor.

Complaint is made of paragraphs 4 and 5 of the main charge in respect to the question of proximate cause, and appellant insists the court erred in refusing to submit to the jury the explanatory charge that the "proximate cause of an accident and injury is any cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury complained of and without which the injury would not have occurred." And "by 'efficient intervening cause' is meant such cause which breaks the causal connection between the original wrong and injury; or an act, disconnected from the first and wrongful cause, operating in itself, which intervenes to produce the re-

sult or accident. The intervening act or event must be sufficient itself to stand as the cause of the injury, and be one but for which the injury would not have occurred."

The writer of this opinion is not very technical (Nichols v. Lorenz [Tex. Civ. App.] 237 S. W. 629, 633) and believes that the charge is given in good plain English, sufficient to instruct the jury, so that they would understand it. The trial judge has properly submitted the question and the charge of the court is sufficient; and the requested charge would not have tended to clarify the matter. The court properly defined "proximate cause" as the "moving and efficient cause, without which the injury in question would not have happened; an act of omission becomes the proximate cause of an injury whenever such injury is the natural and probable consequence of the act of omission in question, and one that ought to have been foreseen by a person of ordinary care and prudence in the light of the attending circumstances. It need not be the sole cause, but it must be a concurring cause, which contributed to the production of the result in question, and but for which the said result would not have occurred." And the court instructed the jury "that to constitute a negligent act the proximate cause of the injury, it need not be the sole cause, but it is sufficient if it is the concurring cause from which such a result might reasonably have been contemplated under the attending circumstances, and if the concurring negligence of two or more persons combined together results in an injury to a third person, the injured person may recover from either or all."

As given, the charge seems to lack nothing of the element suggested by the expression "in continuous sequence unbroken by any new and independent cause." There was no necessity to use the phrase "efficient intervening cause," and to explain the effect of such term to the jury, so we think the court properly defined "proximate cause" as it is used in the charge to the jury, and these propositions are overruled.

We have carefully examined the charges given and refused, and overrule the propositions because we think all the issues in the case, necessary to discuss here, have been fairly and clearly explained to the jury.

As explanatory of the accident, we use the testimony of appellant as set out in appellee's brief:

"When we came out of Fort Worth the shoulders on the road by the side of the pavement, to the best of my recollection, were gravel. When we got to the point where the accident occurred the shoulders on the road were black dirt, and the black dirt was wet and muddy. I do not remember for how great a distance before the time of the accident the gravel had given place to black dirt.

But it was for some distance. I had noticed the change. I do not know that it is a fact that one should have observed greater care when one may be obliged to turn out onto black mud shoulders than when you have gravel shoulders to turn out on. There is always a possibility of being obliged to use the shoulders, that is, if you get crowded off— if a road hog crowds you off or if three cars come abreast, naturally you would slow down and stop. You would be obliged to use the shoulders naturally, and if you saw that that would come up you would slow down and stop. It is necessary to use the shoulders when three cars come abreast, or somebody crowds you off. That is a possibility that may occur at any time. When we came out of Fort Worth this road was wet and it was sleeting and drizzling, and after coming out of Fort Worth the sleet stopped but the drizzle continued, and the road remained wet and slippery. It is a fact that it is not safe to proceed at the same rate on a slippery road with mud shoulders as it is on a dry road with gravel shoulders. In other words, when you get on a wet road with mud shoulders you have to proceed with greater caution; I would advise you to stay at home if you have to drive over that kind of road—that is a dangerous road. I did not know it was a dangerous road, but I know it now. They should have signs up there and tell people to keep off in rainy weather.

"I have been driving a car since 1918. I have driven them almost daily since 1922 or 1923. I did not testify that I found out for the first time in November, 1928, that it was dangerous to drive on a wet, slippery road at as great a rate of speed as over a dry one. I did not testify to that. I said that I discovered at that time that that strip of road out there is a dangerous piece of road. As to what makes it dangerous, I don't know whether it is in the pavement or whether it is a slime that comes off the black dirt, I do not know, I am not in a position to say. I do not know that my rear wheels were slipping and sliding; if that had been the case I would have known that driving was dangerous. While driving along this road I did not know that my hind wheels were slipping and sliding; had I known that I would have slowed down to ten miles an hour. That is the proper speed when your rear wheels begin to skid, ten miles an hour is the proper speed. It is not a fact that what caused my trouble was my right rear wheel skidding off into the mud. It is not a fact that when my car got off onto the right side of the road, off of the pavement, that I threw my steering wheel violently to the left and shot straight across the road into the ditch on the other side. I threw it back and had it in the center of the road. I was going straight down the center of the road, and then I shot off to the left, the front wheels went off, and then it

went sliding, not straight ahead. I got it straightened out and went along the side of that ditch for some distance, about ten or twelve feet on the dirt that was covered with Bermuda grass and some weeds, and then I hit this embankment; I do not know whether that embankment was a side road or what was the purpose of it, but it was an embankment. The embankment went crosswise of the ditch, and I hit that with the left front wheel, and broke the left front wheel. Then Mr. Swancoat fell against the steering wheel itself, and that was when he hit it and broke it. When we hit this embankment was when he hit the steering wheel and broke the mirror. As I said, I turned off the main road, that is, the paved portion of the road, on account of the truck, onto the mud on the shoulders on the right hand side. I do not know how long I stayed on this mud shoulder, but it was not very long, just a few seconds. As to whether it was four or five seconds or two or three seconds, I do not know, as I did not time it. I would not care to go on record saying, because I do not; I do not know how many seconds it takes to run around the car. That is all the time it took to run around the car. You have driven a car and know how long it will take to run around a car driving twenty-five miles an hour. I just took time to go around the car. You say that would not be a few seconds, but would be a part of a split second. Then I got back on the main highway and run down the center of it, and for some unexplained reason my car went slanting to the left and I got off on the shoulder or ditch on the left hand side, and I ran some twelve feet along that ditch, and then hit an embankment. Mr. Swancoat was thrown against the steering wheel and broke it and against the mirror and broke it. After I hit the embankment, I went up over the embankment—the rear wheel got over it, and it just stopped of its own accord.

"When I was driving along the road the truck was not very far off when I saw it first—we had just come over a hill, and it was about fifty yards off, something like that. I did not have my foot on the accelerator at that time; I was slowing down, it is down hill and a curve at that place. The truck was about the center of the road then, so I realized at once, according to my situation, that I had to turn out to pass it. I was about the center of the road, and I had to turn out to pass it, so I passed the truck and went out on the side. I did not put my foot back on the accelerator after that. When I first saw the truck I took my foot off the accelerator and never put it on again on that trip with Mr. Swancoat, which ended just a short distance beyond the truck. I had to have the car repaired before I could start again. You say that I realized that going out there into that mud that I ought to be

running a little slower when I hit the mud. Well, I was not figuring on hitting any mud; I made a very quick turn out. I had practically gotten over on my side of the road, I had gradually eased over on my right after I saw the truck, expecting him to do likewise. I got over well on my side and realized that he was not going to turn to his side and that I would have to turn out further, and then I did turn out further, and when I did one of my wheels went off the hard pavement and into the mud shoulder. I do not remember which wheel went off first, whether it was the rear wheel or the front wheel. I missed hitting the truck by a close shave. After that first wheel went off it was quite some little time before the crash, I ran a little way along the mud shoulder and turned back to the center of the road, and went off to the side and went a little way along over there—it was some seconds before the crash. I did not have my foot on the brake at the time; I did not apply the brake for fear we would turn over. When we hit the embankment and broke the front wheel and threw Mr. Swancoat up against the steering wheel and broke the steering wheel and then threw him up against the mirror and broke the miror, I would say we were going at about twenty miles an hour.

"With regard to how this accident occurred, about which Mr. Swancoat has testified, we left Fort Worth about one o'clock, somewhere around one o'clock, on our way to Laredo. It was raining and sleeting, or rather it had sleeted, and I think it had stopped sleeting and was drizzling. The road is a paved road, but out of Fort Worth it had graveled shoulders. We were following a bus as we drove out, and I noticed the speedometer that they were driving about forty-five miles an hour. I kept up with the bus for, I believe, some fifteen or twenty miles. After the bus stopped at a station, we passed them, and as we passed them, Mr. Swancoat said to me, he said, 'Some ten or twelve years ago I came out here in a car at one time, and I got stuck in here,' and he said, 'There is an awfully slippery place out here and you slide everywhere,' and he said, 'We had better slow down.'"

At and before the accident the car had been traveling at the rate of about sixty miles an hour, about which there was no complaint on the part of plaintiff, until just before the accident, when he suggested that "there is an awfully slippery place out here and you slide everywhere * * * we had better slow down." Showing his familiarity with the road and his knowledge of the speed, appellee testified:

"Mr. Offer and I were driving in his Buick automobile on this wet highway. Just shortly before the accident occurred, Mr. Offer was driving at a rate of speed of forty miles or a little better. I looked at the speedometer

just a short time before that. The fact is, I looked at the speedometer several times. We were running about fifty miles when we came out of Fort Worth. The rear end of the car was going from one side of the road to the other, and I called his attention to it, and I told him, 'If you do not slow up we are going to wreck, Mr. Offer', and in a very short time, just a half a mile or a mile, we did wreck. When I told him we were going to wreck, he slackened up a little, down to about forty miles. I noticed the speedometer as to what the speed was."

It will be seen by the action of the appellee that during the time they were running at something less than sixty miles an hour he was where he could see the speedometer and knew the rate of speed they were traveling, and made no objection or comment about it until just before the accident, when the appellant reduced the speed.

From the view we take of this cause the question of the intervening cause of the injury, because of the truck in the road as a concurring proximate or intervening cause, will not be discussed.

Of course, automobile drivers should keep a lookout for passing cars and avoid them if possible, which is regarded as a jury question. Here both appellant and appellee knew that some kind of damage might result under the circumstances. Appellant was forced from the road because the driver of the truck did not give sufficient room for him to pass. No danger could be anticipated in so doing.

Of course, the driver might anticipate some danger in passing another automobile outside of the paved road, but that is not unusual, for every day expert drivers as well as other kind have so little regard seemingly for the rights of others and are constantly injuring and sometimes killing innocent people.

If we were passing on this case with the sole question being as to the position of an invitee or passenger, we would have no trouble in affirming it. But here the evidence shows that they were riding and traveling together in a joint relation and were jointly undertaking to do the same thing for a broker's commission, and some of the expenses at least were paid by appellee. He was not a guest. He was not a passenger within the meaning of the term. He was traveling in the same car and bearing part of the expenses of travel.

Appellant testified:

"My purpose was to exchange this Kansas City apartment house with Mr. Swancoat— he was to take the Kansas City apartment house and the other man was to take the Swancoat Ranch. So, in the current language of the day, I had to sell Mr. Swancoat on the idea of the apartment house, and that was my purpose in taking him to Kansas City. If I had put this deal through, I would have received a commission on the trade. The way the trade started out, the commission was supposed to be five per cent on about $125,000.00, which would have been about $6,250.00. That is what I was going to make if Mr. Swancoat was satisfied with the apartment house when he saw it and the other man was satisfied with the ranch and they exchanged. So, as you say, it was vitally important to my partnership to do two things, to sell the idea of taking that apartment house to Mr. Swancoat and then induce the Kansas City man to approve his farm. * * *

"There never was any subsequent discussion with Mr. Swancoat about the expenses, and I just told him that Doctor Dunlap was going, and we would all go together, and off we went, as you say. That is the way it happened. Dr. Dunlap testified that he gave me $7.00 in Kansas City; I do not remember the amount, but whatever it was, it was less than $10.00. We figured out the expenses of that trip. I stated yesterday that the expenses were four dollars and some cents. I figured the expenses were $4.60 for the three of us that is, that Mr. Swancoat paid me some $4.60. I said that we prorated the expenses in Kansas City and Mr. Swancoat's part was four dollars and some cents, I think sixty cents, and he paid me. Mr. Swancoat's part would be the same as my part and Dr. Dunlap's part, so to get the $4.60 we divided the total expenses by three, and according to those figures that would make $13.80. Half of $13.80 is $6.90. You say that the $7.00 that Dr. Dunlap gave me covered exactly half of the expenses and ten cents more. I say that would be about one-third of the expenses. You say you got the figures from me and that I figured it up to be $13.80. Well, I did not have them exactly. I have got a record of it, but I did not find the record. That $4.60 is what I gave you as one-third part of the expenses, as the total expenses were $13.80."

The negligence of the driver is not ordinarily chargeable to other occupants of the vehicle, who are riding at the invitation of the driver, and if so by no construction could appellant's negligence be imputed to appellee. Wren v. Suburban (Mo. App.) 241 S. W. 464, 468. In this case the negligence, if any, of appellant was imputed to appellee.

As the errors complained of in this case are such as may not arise on another trial, we have not discussed the same, though have fully considered them and overrule them.

We think the proof is sufficient to sustain the contention of appellant, notwithstanding the jury finding which was against the preponderance of the evidence on the subject of joint enterprise of the parties and other matters complained of.

904

The judgment is set aside, and the judgment is reversed, and the cause remanded for another trial.

SMITH, J.

I concur in the result.

On Motion for Rehearing.

SMITH, J.

It is conceded, is conclusively shown, that the highway upon which appellant was driving was wet and slippery, with shoulders of black mud upon each side. These conditions, and the peculiar dangers thereof, were obvious to appellant, who was an experienced driver. It is further conceded that he was driving under these conditions at a very high rate of speed, and the jury found that appellee, the passenger, protested to appellant against such high speed and appellant's manner of driving, that appellant thereupon slowed down to a speed still in excess of thirty-five miles an hour, and upon attempting to pass an approaching truck appellant's car struck the mud by the roadside and was wrecked. The jury found that in all these operations appellant was guilty of negligence which proximately caused the accident and appellee's consequent injuries. The jury further found that the driver of the truck encountered by appellant in his reckless speeding over the obviously dangerous road was not guilty of any negligence proximately causing the accident. In other words, the jury very properly found, from an abundance of evidence, that the accident was chargeable wholly to appellant's negligence.

■■ Appellant sought to evade liability by the defense that he and appellee were engaged in a joint enterprise at the time of the accident, "and had equal rights to direct and control the operation of the automobile in which they were riding," and that therefore the negligence of appellant in operating the vehicle will be imputed to appellee. If this defense had been sustained by responsive findings of the jury upon sufficient evidence, it would have relieved appellant of liability. But appellant's contention was not sustained upon either phase of that defense. For, first, the jury found, upon sufficient evidence, that the parties were not engaged in a "joint enterprise," as that term was properly defined in the court's instruction; and, second, there was no finding and no sufficient evidence to support a finding that both appellant and appellee were equally in joint control and possession of the car with respect to its management and operation, at the time of the accident. The negligence of the driver cannot be imputed to the passenger, in a controversy between themselves, unless it be shown, not only that they were at the time in pursuit of a joint undertaking, but that the passenger

had equal control and management, with the driver, over the operation of the vehicle. Berry, Law of Auto. (4th Ed.) § 565 et seq.; Huddy Auto. (5th Ed.) § 682; 5 Tex. Jur. 792, § 175, and authorities there cited. So, this defense was destroyed in this case by the finding of no joint enterprise, and besides was unavailable in the absence of a finding of a common control of the operation of the vehicle. We gravely doubt if the evidence was sufficient to raise the latter issue, or authorize its submission. And in any event, it appears that appellee beseeched appellant to reduce the obviously reckless speed he was maintaining, and to exercise more care, and in this way appellee exercised all the control available to him in the situation. The whole record shows a flagrant recklessness on the part of appellant in the face of open and obvious dangers, and in spite of the protests and warnings of appellee. The cause was fully and correctly submitted to the jury, and their findings against appellant upon all the issuable facts have settled the case.

We conclude upon rehearing that the judgment should be affirmed, and it is so ordered.